# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**EDDIE LEE THOMAS SMITH,**        :
                                                        :
     **Plaintiff,**        :        **CIVIL ACTION FILE NO.**
                                                        :        **1:16-CV-04686-AJB**
**v.**                                               :
                                                        :
**NANCY A. BERRYHILL,**        :
*Acting Commissioner*        :
*of Social Security,*        :
                                                        :
     **Defendant.**        :

# O R D E R   A N D   O P I N I O N[1]

    Plaintiff Eddie Lee Thomas Smith brought this action pursuant to § 1631(c) of

the Social Security Act, 42 U.S.C. § 1383(c)(3), to obtain judicial review of the final

decision of the Acting Commissioner of the Social Security Administration ("the

Commissioner") denying his application for Supplemental Security Income ("SSI").[2]

---

    [1]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Dkt. Entries dated 01/17/2017). Therefore, this Order constitutes a final Order of the Court.

    [2]    Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for SSI for the disabled. Title II of the Social Security Act provides for federal Disability Insurance Benefits ("DIB"). 42 U.S.C. § 401, *et seq.* The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing a claim for SSI. *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)). Title 42 U.S.C. § 1383(c)(3) renders the judicial provisions of

For the reasons set forth below, the undersigned **AFFIRMS** the final decision of the Commissioner.

I.     **PROCEDURAL HISTORY**

Plaintiff filed an application for SSI on May 28, 2010 alleging disability commencing that same date. [Record (hereinafter "R") 252]. Plaintiff's application was denied initially and on reconsideration. [R145, 153]. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). [R165]. A hearing was held on February 9, 2012 where Plaintiff was represented by counsel. [R34-69]. The ALJ issued a decision on March 28, 2012, denying Plaintiff's application on the ground that he had not been under a "disability" at any time through the date of the decision. [R128].

Plaintiff sought review by the Appeals Council, which vacated the ALJ's decision and remanded the case on the grounds that the ALJ's decision did not

---

42 U.S.C. § 405(g) fully applicable to claims for SSI. In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "Period of Disability," or to recover SSI. However, different statutes and regulations apply to each type of claim. Many times parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this Order should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

AO 72A
(Rev.8/8
2)

(1) address all IQ test scores, (2) clarify Plaintiff's cognitive impairment in the RFC, and (3) state limitations in vocationally relevant terms. [R141-42].

Another hearing was held on August 25, 2015. [R73]. On September 25, 2015, the ALJ issued a second decision, concluding that Plaintiff was not disabled. [R14]. Plaintiff sought review by the Appeals Council, [R12], which review was denied on October 28, 2016, [R6], making the ALJ's decision the final decision of the Commissioner.

Plaintiff then filed the instant action in this Court on December 21, 2016, seeking review of the Commissioner's decision. [Doc. 1]. The answer and transcript were filed on May 30, 2017. [Docs. 9-10]. On July 5, 2017, Plaintiff filed a brief arguing that the Commissioner's decision must be reversed, [Doc. 13], and on August 2, 2017, the Commissioner filed a response in support of the decision, [Doc. 14].[3] The matter is now before the Court upon the administrative record, the parties' pleadings and briefs,[4] and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

---

[3] Plaintiff did not file a reply brief. (*See* Dkt.).

[4] Neither party requested oral argument. (*See* Dkt.).

AO 72A
(Rev.8/8
2)

## II.   PLAINTIFF'S CONTENTIONS

As set forth in Plaintiff's brief, the issue to be decided is whether the ALJ erred in concluding that Plaintiff did not meet Listing 12.05 by not finding that:

1.    Plaintiff meets the second requirement of the Listing 12.05C test;

2.    Plaintiff's IQ score range of 60 to 70 on three different testing occasions satisfied the first requirement of the Listing 12.05C test; and

3.    Deficits in Plaintiff's adaptive functioning that manifested prior to the age of 22 satisfied the third requirement of the Listing 12.05C test.

[Doc. 13 at 1].

## III.  STATEMENT OF FACTS[5]

### A.    Background

Plaintiff was born in July 1984 and, therefore, was 26 years old on the alleged onset date. [R252]. Plaintiff completed eighth grade, [R82], in special education classes, [R49]. Although, he left his work history report incomplete, [R286], Plaintiff received some negligible W2 income in 2004, 2008, and 2011-12. [R272-73]. He alleges disabling conditions of learning disabilities and an inability to read. [R292].

---

[5]    In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal. [*See* Docs. 13, 14].

4

**B.    Lay Testimony**

Plaintiff testified at his 2012 and 2015 hearings.  In 2012, Plaintiff testified that he lived with his then-girlfriend, Neekol Maria Brown ("Ms. Brown"), in rented Section 8 housing. [R41].  In 2015, he testified that he was engaged to LaQuanda Berley, who paid for the apartment in which they lived together with her three children. [R79-81].  In 2012, he testified that he has a seven year old daughter who lived with him but that she was mostly cared for and financially supported by Ms. Brown.  [R47]. In 2015, he testified that this daughter resided with her mother.  [R80].

Plaintiff testified that, in the past, he worked at a Dollar Store position he got through his girlfriend, but, after two days,  gave up because he could not read the labels to "put stuff in position the correct way."  [R44-45, 51].  He also testified that he previously worked at a recycling place cleaning catalytic converters and, because the supervisor got on his nerves, he would "just walk off . . . just leave." [R102, 113-14]. Plaintiff explained that he stopped going to that job because it only provided him with work six days a month.  [R114].  He testified that a girlfriend got him a job at a warehouse that required a lot of reading and because he was paid based on what he could produce, he stopped working when his paycheck "was like a $100 and something dollar."  [R102-03].

5

Upon questioning, the ALJ confirmed that Plaintiff had previously worked as a "driver's helper" for less than a month when he was 17 or 18, through a temporary agency, which consisted of unloading food from trucks. [R110-11]. He testified that he cannot follow verbal instructions because he forgets. [R106].

Plaintiff further testified that he does not have a driver's license because he does not know how to read, but that he can write his name. [R41-42, 47]. In 2012, he testified that Ms. Brown took him to the hearing, [R42], and, in 2015, he testified that his sister and her boyfriend took him, [R81]. He claimed that he has never taken public transit by himself and cannot read street signs to drive. [R50].

Plaintiff stated that he can do dishes but can only cook simple things like noodles. [*Id.*]. He does not know how to do laundry. [R52]. He described his reading and writing abilities as poor and his arithmetic as fair. [R42-43]. He testified that he cannot read his own mail, books, newspapers, or magazines, and required help filling out his SSA application and reports. [R49, 86]. When he received checks for work, he cashed them with someone's help. [R52]. He reported that has never gone grocery shopping alone, [R53], and that he has tried to use a computer but cannot because he "doesn't know what to look for." [R84]. He spends his days watching television.

6

AO 72A
(Rev.8/8
2)

[R45]. Plaintiff's girlfriends also testified and, essentially, verified Plaintiff's statements concerning his living situation and daily activities. [R54-60, 89-98].

## C.    Objective Records

### 1.    Educational Testing Records

On December 6, 1993, when Plaintiff was in third grade, Gail Golden performed the Wechsler Intelligence Scale for Children-III (WISC-II) and evaluated him with an overall IQ of 75, noting weaknesses in visual sequencing, processing speed, and cognitive functioning (reasoning/judgment organization). [R383].

On October 10, 1996, when Plaintiff was 12 years old, David Batchelor, a school psychologist, administered the WISC-II, the Development Test of Visual-Motor Integration (VMI), the Wide Range Achievement Test-3 (WRAT-3), the LD Screening Checklist, and the Kaufman Brief Intelligence Test as part of the three-year re-evaluation requirement for students in special education programs. [R432]. Plaintiff was assessed with an IQ of 68 with a borderline range on the verbal scale and a mid-range on the performance scale, resulting in overall intelligence in the mid range with weaknesses in long-term memory of factual data. [R433-34]. Dr. Bachelor concluded that Plaintiff's "inappropriate behavior patterns interfere with classroom functioning and social/emotional development." [R435].

AO 72A
(Rev.8/8
2)

## 2. Consultative Exams

On July 21, 2010, Plaintiff was referred for evaluation to consultative medical examiner Steven Snook, Ph.D., ("Dr. Snook"), a licensed psychologist. [R350-56]. Dr. Snook conducted a clinical interview and mental status examination; administered the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV), Wide Range Achievement Test-Fourth Edition (WRAT-4), Trail Making Test Part A and B, and Rey 15 Item Memory Test; and reviewed records. [R351]. He noted that Plaintiff was driven to the examination by Ms. Brown, who provided collateral information after Plaintiff's initial interview. [R352]. Plaintiff reported "no significant medical concerns" and alleged impairments of learning disability and illiteracy. [*Id.*].

Plaintiff reported leaving high school after completing eighth grade, enrollment in special education classes while in middle school, and receiving grades of D's and F's. [*Id.*]. Although Plaintiff denied difficulties with teachers and peers, the records reviewed reflected frequent truancy. [*Id.*]. Plaintiff reported that he worked for a delivery service for three months but lost control of a dolly and injured his leg. [*Id.*]. He also reported that he never received mental health treatment or was hospitalized for psychiatric reasons but, at the evaluation, both Plaintiff and Ms. Brown reported "irritability and mood swings" beginning during Plaintiff's five month incarceration for

8

cocaine possession, as well as recent sleep disturbance and decreased appetite. [R352-53].

Plaintiff reported that he was "able to attend to his activities of daily living independently to include showering, grooming, and dressing." [R353]. He also reported that he could prepare simple foods in the oven or microwave, perform basic household chores, including the use of appliances and laundry-related tasks, had no driver's license (but could drive), could make simple purchases, but had limited financial management ability (requires assistance with bank statements and legal documents). [*Id.*].

Dr. Snook found that Plaintiff's behavior was cooperative, his speech normal, his associations tight, his thought content grossly logical, and his recent and remote memory, insight, judgment, and decision-making abilities were intact. [*Id.*]. However, Dr. Snook noted that Plaintiff's "effort was less than would have been anticipated" as he "appeared to have minimal difficulty with attention and concentration however tended to give up easily despite redirection and praise." [R354]. His scores on the Trail Making tests were in deficient ranges as was his IQ score of 63. [R355]. Dr. Snook noted that, if retested, there is a 95 percent chance Plaintiff would achieve an IQ score between 60 and 68. [*Id.*].

AO 72A
(Rev.8/8
2)

However, Dr. Snook also noted that Plaintiff's

scores were considered to be under representations of his current level
intellectual ability.  Although he was cooperative throughout the interview
and made no obvious attempts to malinger, his efforts during assessments
were less than would be anticipated.  Therefore, the validity of scores and
provided information was questionable.

[*Id.*].  Dr. Snook further noted that, although Plaintiff's

cognitive assessment indicated a deficient level of functioning, he was
viewed to most likely function within a borderline range of ability based
on content of conversation . . . has a significant legal history . . . a history
of marijuana abuse and indicated currently smoking marijuana four times
per week on average . . . based on his consistent substance use and
questionable effort at times during the evaluation, diagnosis was deferred.

 [R356].  Dr. Snook opined that Plaintiff would have

minimal difficulty maintaining attention and concentration.  He would
likely be able to understand and remember simple but not complex
instructions.  Currently, he would not likely have difficulty interacting
withy peers, supervisors, and the general public.  He would likely be able
to adhere to work schedules and meet appropriate production norms.

[*Id.*].

### D.    Vocational-Expert Testimony

Vocational experts ("VE") testified at both of Plaintiff's hearings before the ALJ.

[R62-69 (2012); R109-20 (2015)].  At the 2015 hearing, the ALJ asked the VE what

a person of Plaintiff's age, education, and experience with a medium exertional level,

10

AO 72A
(Rev.8/8
2)

with difficulty reading and written instructions, who is restricted to simple tasks and can understand and carry out basic instructions and should avoid interactions with large crowds of people, a fast pace or condensed time pressures and quotas, can do. [R116-17]. The VE testified that such a person could be a bus person/dining room attendant, of which there are 1,000 positions in Georgia and 57,800 positions nationally; a launderer, of which there are 800 positions in Georgia and 27,700 positions nationally; and an automobile detailer, of which there are 1,200 positions in Georgia and 50,600 nationally. [R117-18].

The ALJ also asked what jobs the Plaintiff could do if he changed the hypothetical to light work, instead of medium, and added the limitation of poor ability to focus and maintain attention and concentration, work schedule and attendance, and keep and handle work place stress. [R118-19]. The VE responded that under that hypothetical, there would be no work that Plaintiff could perform. [R119].

## IV.  ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact:

1.  The claimant has not engaged in substantial gainful activity since May 28, 2010, the application date (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments: organic mental disorder, affective disorder, history of low blood pressure, and

11

AO 72A
(Rev.8/8
2)

history of polysubstance abuse (alcohol and illicit drugs) (20 CFR 416.920(c)).

. . .

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

. . .

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of medium work as defined in 20 CFR 416.967(c). The claimant is limited to frequently kneeling, crouching, stooping, and balancing and occasionally crawling and climbing ropes, ladders, and scaffolds. The claimant is restricted to simple tasks but may occasionally have difficulty understanding written instructions. However, he can understand verbal instructions. The claimant must avoid interacting in a work place with large crowds of people (five or more at a time). He must also avoid jobs requiring fast pace, intense job production quotas. However, with these restrictions, he is able to focus and maintain attention/concentration and complete a normal workday schedule.

. . .

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on July 15, 1984 and was 25 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

AO 72A
(Rev.8/8
2)

7.    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not an issue because claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

. . .

10.    The claimant was not under a disability, as defined in the Social Security Act, at any time since May 28, 2010, the date the application was filed (20 CFR 416.920(f)).

[R19-26].

The ALJ accorded "substantial weight" to Dr. Snook, who conducted a psychological evaluation of Plaintiff, diagnosed cannabis abuse, and a Global Assessment of Functioning ("GAF") of 75,[6] and opined that Plaintiff could understand and remember simple instructions, interact with peers, supervisors, and the public,

_____

[6]    The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000) ("DSM-IV-TR"). A GAF score in the range of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." DSM-IV-TR at 34.

13

adhere to work schedules, meet appropriate production norms, and would not likely

decompensate under stressful situations. [R24]. However, the ALJ observed that

"Dr. Snook questioned the validity of scores and information provided." [*Id.*]. The

ALJ also noted Plaintiff's 1993 and 1996 childhood IQ testing results and concluded

that

> [t]he evaluating psychologist's notes regarding behaviors that might have
> hindered the claimant's October 1996 intellectual testing scores as well as
> the higher intellectual scores he achieved on testing just three years prior
> support Dr. Snook's opinion that the claimant could have  performed
> better during the consultative psychological evaluation.

[*Id.*]. In evaluating whether Plaintiff met Listing 12.05C, the ALJ concluded that

> [a]lthough the claimant has verbal, performance, and IQ scores below 70,
> he has not described daily activities that were not limited to the extent one
> would expect.  The claimant noted he was able to tend to his personal
> hygiene and grooming needs independently . . . prepare meals, perform
> household chores, drive, and make simple purchases.

[R21-22].

The ALJ explained Plaintiff's "statements concerning the intensity, persistence

and limiting effects of these symptoms are not entirely credible," [R25], because

Plaintiff

> described daily activities that are not limited to the extent one would
> expect given the complaints of disabling symptoms and limitations.
> Furthermore, the record reflects no actual treatment for the alleged

14

impairments.  Moreover, a review of the claimant's work history shows that the claimant worked only sporadically prior to the alleged disability onset date, which raises a question as to whether the claimant's continued unemployment is actually due to medical impairments.

[*Id.*].

## V.    STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing

AO 72A
(Rev.8/8
2)

the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age,

AO 72A
(Rev.8/8
2)

education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## VI. SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was

17

substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court]

18

must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VII. ANALYSIS

Plaintiff claims that the ALJ erred as a matter of law by failing to find that Plaintiff met Listing 12.05C. [Doc. 13 at 1]. The Listing of Impairments in Appendix 1 of Subpart P describes for each of the major body systems impairments that are considered to be severe enough to render an individual disabled. 20 C.F.R. § 404.1525(a). As noted above, at the third step of the five-step disability evaluation process, the ALJ must determine whether a claimant's impairments meet or equal one of the Listings and meet the duration requirement.[7]

_____

[7] An impairment "must have lasted or must be expected to last for a continuous period of at least 12 months" to meet the duration requirement. *See* 20 C.F.R. § 404.1509.

AO 72A
(Rev.8/8
2)

20 C.F.R. § 404.1520(a)(4)(iii). If a claimant meets or equals a Listing, then he is disabled. *Id.*

A claimant meets a Listing if he has a diagnosis included in the Listings and provides medical reports documenting that his conditions meet the specific criteria in the Listings. *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (per curiam) (citing 20 C.F.R. § 404.1525(a)-(d)). A claimant equals a Listing if the medical findings show an impairment at least equal in severity and duration to the criteria set out in the Listing. *Wilson*, 284 F.3d at 1224. Where a claimant alleges that he has an impairment that meets or equals a Listing, he bears the burden of presenting evidence showing how his impairment meets or equals the Listing. *Wilbon v. Comm'r of Soc. Sec.*, 181 Fed. Appx. 826, 828 (11th Cir. May 18, 2006) (per curiam) (citing *Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987) (per curiam)).

The introduction to the mental-disorder listings explains that the structure of the mental disorders listings for intellectual disability (Listing 12.05) differs from that of other mental disorders listings. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A. Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability and additional sets of criteria. *Id.* To meet Listing 12.05, the impairment must satisfy the diagnostic description in the introductory paragraph and

AO 72A
(Rev.8/8
2)

any one of the additional sets of criteria found in paragraphs A, B, C, or D. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A); *see id.*, referencing §§ 12.05A-D, 112.05A-F); *see also* 20 C.F.R. § 416.925(c)(3) (stating that an impairment meets a listing only "when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction"). This requires the claimant to satisfy two sets of criteria.

First, the claimant must show his impairment causes "significantly subaverage general intellectual functioning with deficits in adaptive functioning" initially manifested during the developmental period—that is, the evidence demonstrates or supports onset of the impairment before age 22. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.05, 112.05. The diagnostic descriptions at Listing 12.05 are consistent with accepted medical standards, which recognize that a diagnosis of intellectual disability must be based on deficits or impairments in adaptive functioning rather than on IQ scores alone. *Compare* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.05, 112.05 *with* DSM-IV-TR at 41-43, 49; *see also* DSM-IV-TR at 42 ("Impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with [Intellectual Disability]."). "[A]daptive functioning 'refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociological

AO 72A
(Rev.8/8
2)

background, and community setting.' " *O'Neal v. Comm'r of Soc. Sec.*, 614 Fed. Appx. 456, 459 (11th Cir. June 10, 2015)[8] (quoting DSM-IV-TR at 42); *see also Heller v. Doe*, 509 U.S. 312, 329 (1993) (explaining that within the context of "mental retardation," adaptive functioning refers to an individual's "effectiveness in areas such as social skills, communication, and daily living skills, and how well the person meets the standards of personal independence and social responsibility expected of his or her age by his or her cultural group") (internal punctuation omitted); *Rodriguez v. Comm'r of Soc. Sec.*, 633 Fed. Appx. 770, 774 (11th Cir. Dec. 31, 2015) ("[A]daptive functioning refers 'to how well a person meets standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical.' ") (quoting *Diagnostic and Statistical Manual of Mental Disorders* 37 (5th ed. 2013)); *Schrader v. Acting Comm'r of Soc. Sec. Admin.*, 632 Fed. Appx. 572, 576 (11th Cir. Dec. 23, 2015) (noting that the Commissioner's policy states that "adaptive functioning refers 'to the individual's progress in acquiring mental, academic, social and personal skills as compared with

---

[8]     While unpublished opinions are not binding precedent, they may be considered as persuasive authority. *See* 11th Cir. R. 36-2; *see also United States v. Almedina*, 686 F.3d 1312, 1316 n.1 (11th Cir. 2012).

22

AO 72A
(Rev.8/8
2)

other unimpaired individuals of his/her same age.' " (quoting Program Operations Manual System ("POMS") DI 24515.056(D)(2), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0424515056 (last visited 3/8/2018)[9]).

Second, after the claimant satisfies the diagnostic descriptions of intellectual disability in the introductory paragraph of Listing 12.05, the claimant must meet the severity requirements for one of the additional sets of criteria in the relevant listing. *O'Neal*, 614 Fed. Appx. at 459 (Listing 12.05); *Dunn v. Colvin*, No. 1:12-cv-3256-WSD, 2014 WL 221171, at *8 (N.D. Ga. Jan. 21, 2014) (Duffey, J.) (Listing 112.05). The required level of severity for subsection C is met when the claimant has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id*. Thus, a claimant meets Listing 12.05C if he shows: (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested before age 22 ("adaptive-deficit requirement"); (2) a valid IQ score between 60 and 70 ("IQ-score requirement"); and (3) other physical or mental impairments that impose significant work-related limitations ("other-impairment requirement"). *See*

---

[9]       "While the POMS does not have the force of law, it can be persuasive." *Stroup v. Barnhart*, 327 F.3d 1258, 1262 (11th Cir. 2003).

20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.00A, 12.05C; *Gibson v. Astrue*, No. 1:09-cv-677-AJB, 2010 WL 3655857, at *9 (N.D. Ga. Sept. 3, 2010) (Baverman, M.J.); *see also Pettus v. Astrue*, 226 Fed. Appx. 946, 948 (11th Cir. Apr. 5, 2007) (per curiam) (citing *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

However, "a valid IQ score need not be conclusive of mental retardation where the score is inconsistent with other evidence in the record on the claimant's daily activities and behavior." *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992); *accord Hubbard v. Colvin*, 643 Fed. Appx. 869, 872 (11th Cir. Feb. 17, 2016) ("A valid IQ score is not conclusive evidence that a claimant has deficits in adaptive functioning if the 'score is inconsistent with other evidence in the record on the claimant's daily activities and behavior.' ") (quoting *Lowery*, 979 F.2d at 837); *Outlaw v. Barnhart*, 197 Fed. Appx. 825, 827 (11th Cir. Aug. 10, 2006) ("[A] valid IQ score is not conclusive of mental retardation when the IQ score is inconsistent with other evidence in the record about claimant's daily activities."). Indeed, an ALJ is allowed some leeway to evaluate other evidence when determining the validity of an IQ score. *Henry v. Barnhart*, 156 Fed. Appx. 171, 173 (11th Cir. Nov. 25, 2005) (citing *Lowery*, 979 F.2d at 837). "An ALJ should examine whether the results of an I.Q. test are

24

consistent with the other medical evidence and the claimant's daily activities and behavior. *Henry, id.* (citing *Popp v. Heckler*, 779 F.2d 1497, 1499-1500 (11th Cir. 1986)); *see also Siron v. Comm'r, Soc. Sec. Admin.*, 556 Fed. Appx. 797, 799 (11th Cir. Feb. 18, 2014) ("[R]esults of intelligence tests are only part of the overall assessment, [and] the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation.' ") (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00D.6.a.).

> **A.    Whether Plaintiff's IQ scores on three different occasions satisfy the first requirement of Listing 12.05C.**

Plaintiff concedes that Dr. Snook found his IQ score of 63 underrepresentative due to Plaintiff's overall presentation and, although he found Plaintiff deficient and that there was a 95% chance Plaintiff would attain the same range if re-tested, he deferred a conclusion on his intellectual diagnosis.  [Doc. 13 at 8 (citing R355)].  However, Plaintiff claims that the ALJ erred as a matter of law because he accepted Plaintiff's 1993 IQ scores, did not acknowledge that his 1996 scores were a valid reflection of his functioning, and held that Dr. Snook "questioned the validity of [Plaintiff's IQ] scores."

AO 72A
(Rev.8/8
2)

[*Id.* at 10-11]. Plaintiff also contends that merely because Dr. Snook found the scores "questionable" did not mean that he found them "invalid." [*Id.* at 10].

The Commissioner counters that the ALJ may find Plaintiff's IQ scores invalid if they are inconsistent with other evidence and, if the ALJ did err, such error was harmless because the ALJ did not find that Plaintiff had the adaptive functioning deficits necessary to meet Listing 12.05C. [Doc. 14 at 14-15].

As a preliminary matter, the Court notes that the ALJ considered both Plaintiff's 1993 and 1996 IQ scores. [R24]. Additionally, it is not clear that the 1993 or 1996 test scores were performed by "Federal and State agency medical and psychological consultants, and other contracted medical and psychological experts[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00H(2)(d). [R361, 383]. Moreover, unlike Dr. Snook's report, the 1993 and 1996 reports to not opine on their own validity, *id.*, or contain a "narrative report that accompanies the test results [and] comment[s] on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00D.6.a. Given the recency and comprehensiveness of Dr. Snook's examination, his qualifications as an expert, and his narrative report and comments on the validity

AO 72A
(Rev.8/8
2)

of the tests he conducted, as compared to the 1993 and 1996 IQ scores, the Court finds no error in the ALJ's decision to accord greater weight to Dr. Snook.

However, assuming the ALJ did err in the weight and interpretation of Dr. Snook's IQ findings, there was no error because, as the Commissioner notes, valid IQ scores create a presumption that may be rebutted with evidence of the claimant's daily life. [Doc. 14 at 16]; *see also Henry*, 156 Fed. Appx. at 173; *Siron*, 556 Fed. Appx. at 799. Indeed, the regulations provide that:

> We generally presume that your obtained IQ score(s) is an accurate reflection of your general intellectual functioning, unless evidence in the record suggests otherwise. Examples of this evidence include: a statement from the test administrator indicating that your obtained score is not an accurate reflection of your general intellectual functioning, prior or internally inconsistent IQ scores, or information about your daily functioning.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00H(2)(d). Here, the ALJ noted Plaintiff's 1993, 1996, and adult IQ scores, the statement from Dr. Snook regarding the accuracy of the tests he scored, and information–from evaluators, Plaintiff, and lay witnesses–concerning Plaintiff's daily functioning, to conclude that, despite his IQ scores, he did not meet Listing 12.05C. [R21-22]. As such, the ALJ did not err in his consideration of Plaintiff's IQ scores and, even if he had, that error was harmless

because he ultimately found that Plaintiff did not meet the listing *despite* meeting the IQ score requirement.  [*Id.*].

**B.    Whether the Plaintiff meets the second requirement of Listing 12.05C.**

As noted previously, under Listing 12.05C, the claimant must show both a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C.  Plaintiff claims that the ALJ erred as a matter of law because, although the ALJ found Plaintiff had severe impairments of affective disorder, history of low blood pressure, and polysubstance abuse disorder in addition to an organic mental disorder, he did not  find that Plaintiff met the "other impairment" prong of Listing 12.05C.  [Doc. 13 at 7].

The Court disagrees.  First, the ALJ did not conclude that Plaintiff did not meet the "other impairment" requirement of Listing 12.05C.   Rather, as discussed in Part VII.A *supra*, the ALJ used Plaintiff's daily activities to rebut the IQ scores' presumed validity, which is permissible under  20 C.F.R. Pt. 404, Subpt. P, App. 1, §  12.00H(2)(d).   [R21-22].   *See Nichols v. Comm'r, Soc. Sec. Admin.*, 679 Fed. Appx. 792, 796-97 (11th Cir. Feb. 8, 2017) (holding that the ALJ did not err

AO 72A
(Rev.8/8
2)

in finding claimant's IQ score of 59 invalid where her range of activities and accomplishments, including reading and understanding English, having a driver's license, completing high school with a certificate, having a history of some unskilled work, raising two children, and handling money, were inconsistent with the IQ results); *Tubbs v. Berryhill*, Civ. A. No. 15-00597-B, 2017 WL 1135234, at * 4 (S.D. Ala. Mar. 27, 2017) ("Presumptive disability pursuant to Listing 12.05C is rebuttable, however, and the Commissioner is charged with determining whether there is sufficient evidence to rebut the presumption."). Consequently, because the ALJ properly rebutted the validity of Plaintiff's IQ scores, no reversible error has been shown in the ALJ's conclusion that Plaintiff did not satisfy Listing 12.05C.

C. **Whether the record demonstrates deficits in adaptive functioning that manifested prior to age 22, meeting the third requirement of Listing 12.05C.**

Plaintiff claims that the ALJ erred by failing to find that he had adaptive deficits prior to age 22. [Doc. 13 at 18]. More specifically, Plaintiff claims that his adaptive deficits are "manifested by low academic achievement with special education classes and dependence on others to perform simple tasks including reading, filling out forms, ands taking the bus as well as a very sporadic employment history." [*Id.*]. The Commissioner responds that

AO 72A
(Rev.8/8
2)

[a]ssuming arguendo that poor grades, with additional information about the reason for such grades, may demonstrate in general that a person has subaverage intellectual functioning, Plaintiff has not shown how his grades demonstrate deficits in adaptive functioning. Plaintiff's grades do not so show in this case because Dr. Snook considered Plaintiff's educational history and yet did not conclude that Plaintiff had an intellectual disability. In fact, Dr. Snook opined that given Plaintiff's level of education, employment positions, and content of conversation, his scores on the IQ test were underrepresentative of his current level of intellectual ability.

[Doc. 14 at 19-20 (internal citations omitted)]. The Commissioner also argues that "whether Plaintiff was independent or dependent in his daily activities is a question of fact, not law, and the ALJ was well within his discretion to conclude, based on Plaintiff's own admissions and Dr. Snook's evaluation, that Plaintiff maintained his independence. [*Id.* at 20 (internal citations omitted)].

The Court agrees with the Commissioner that there are no grounds for reversal in any of these arguments. It is well established that an ALJ is not required to find in the claimant's favor simply because there is record evidence that provides support for the claimant's allegations. As the Eleventh Circuit has stated, "Even if the evidence preponderates against the Commissioner's findings, [the court] must affirm if the decision reached is supported by substantial evidence." *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (per curiam) (internal quotation marks omitted).

30

Thus, the fact that portions of the record evidence support Plaintiff's allegations does not require a finding that the ALJ's decision was not supported by substantial evidence or otherwise require reversal.

## VIII. CONCLUSION

For all of the above and foregoing reasons, the final decision of the Commissioner denying Plaintiff SSI benefits is **AFFIRMED**.

The Clerk is **DIRECTED** to enter final judgment in favor of the Commissioner.

**IT IS SO ORDERED and DIRECTED**, this the 7th day of March, 2018.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)